# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

MICHELLE L. SLEPCEVICH,

        **Plaintiff,**

       **v.**                          **Case No. 17-CV-1081**

INTERTRACTOR AMERICA CORP.,

        **Defendant.**

---

## DECISION AND ORDER

---

### INTRODUCTION

Plaintiff Michelle Slepcevich brought this action against defendant Intertractor America Corporation, alleging that sexual harassment created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. (ECF No. 1.) Intertractor moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). (ECF No. 15.) All parties have consented to the full jurisdiction of a magistrate judge. (ECF Nos. 4, 7.) Intertractor's motion is ready for resolution.

## FACTS

### Intertractor America Corporation

Headquartered in Elkhorn, Wisconsin, Intertractor is engaged in the design, engineering, manufacture, and assembly of full undercarriages and track frames for construction and similar equipment, such as cranes, planers, milling machines, and other special track-mounted vehicles. (ECF No. 27, ¶ 1.)

### Slepcevich's Employment with Intertractor

In September 2011 Slepcevich began working as a temporary worker at Intertractor. (ECF No. 27, ¶ 3.) In February 2012 Intertractor hired her as an employee in its Planning Department. (*Id.*, ¶ 4.) In that role she reported to Supply Chain Manager Kenneth Bleeker and was responsible for updating records, performing invoicing, and contacting customers. (*Id.*, ¶ 5.) In April 2013 Intertractor transferred her to an Accounting Assistant role in its Finance Department. (*Id.*, ¶ 6.) As an accounting assistant, she reported to Director of Finance Tim Archibald and was responsible for assisting the accounting team with receivables and payables, performing invoicing, and occasionally assisting the Human Resources Department with updating records. (*Id.*, ¶ 7.)

In June 2014 a customer service representative resigned. (ECF No. 27, ¶ 8.) General Manager Nathan Stupka sought to promote an internal candidate who was already familiar with Intertractor's difficult-to-use computer system and who had relationships with existing customer service representatives. (*Id.*, ¶ 9.) Slepcevich was identified as a

candidate and Stupka offered her the position in July 2014, which she accepted. (*Id.*, ¶¶ 10-14.)

As a customer service representative Slepcevich was the primary point of contact for her assigned customers. (ECF No. 27, ¶ 15.) She was responsible for engaging in timely and accurate communications with customers by way of phone and email; entering customer orders and resolving issues related to those orders; serving as the liaison between the customer, production, and the sales managers to ensure that parts were available and timely delivered to the customer; pulling and printing shipping tickets; and completing customer returns. (*Id.*, ¶¶ 15-16.)

Intertractor employed three other customer service representatives in addition to Slepcevich: Angela Ratkowski, Nikki Lile, and Cheryl Grimm. (ECF No. 27, ¶ 17.) They all reported to Stupka. (*Id.*, ¶ 20.) Stupka worked primarily from his home in Elkhart, Iowa, but, during the first six months that Slepcevich worked as a customer service representative, he visited the Elkhorn office approximately twice per month and stayed for approximately five days per visit. (*Id.*, ¶¶ 22-24.)

**Intertractor's Policy Against Sexual Harassment**

Throughout Slepcevich's employment as a customer service representative, Intertractor maintained, published, and enforced a Code of Business Conduct. (ECF No. 27, ¶ 25.) The Code of Business Conduct prohibited discrimination and harassment— including quid pro quo and hostile work environment harassment—on the basis of sex.

(*Id.*, ¶ 26.) As noted in its Code of Business Conduct, Intertractor expected any employee who witnessed or experienced discrimination or harassment to immediately report the conduct. (*Id.*, ¶ 27.) The company provided employees with multiple reporting avenues, including their immediate manager, their manager's manager, and the Human Resources Department. *(Id.,* ¶ 28.) Slepcevich received a copy of the Business Code of Conduct in January 2014 and understood that she was expected to comply with the policies it contained. (*Id.*, ¶ 31.)

### Slepcevich and Stupka's Romantic Relationship

In early September 2014 Slepcevich and Stupka began to develop a personal relationship. Slepcevich texted Stupka to share that she and her son would be attending a BMX competition in Iowa. (ECF No. 27, ¶ 35.) She asked him if he knew the town where the competition was occurring, how long it might take to get there, and whether she should anticipate winter weather. (*Id.*)

On a subsequent visit to the Elkhorn office, Stupka observed that Slepcevich appeared stressed. (ECF No. 27, ¶ 37.) Stupka told her that he would listen if she needed to talk. (*Id.*) In response, Slepcevich told him that she was having difficulties with her ex-husband and was trying to find a house to rent so that she could leave him. (*Id.*)

On September 16, 2014, Stupka invited the customer service representatives to a team-building dinner at the Grand Geneva Hotel in Lake Geneva, Wisconsin. (ECF No. 27, ¶ 38.) Slepcevich, Lile, and Grimm attended the dinner. (*Id.*, ¶ 39.) After dinner Stupka

invited Slepcevich to spend time alone with him. (*Id.*, ¶ 41.) Slepcevich declined because Stupka was married. (*Id.*, ¶ 42.) Slepcevich suffered no adverse employment action as a result. (*Id.*, ¶ 43.)

Slepcevich and Stupka continued to exchange text messages. (ECF No. 27, ¶ 44.) In the course of doing so, Slepcevich expressed that she had feelings for Stupka. (*Id.*)

On October 10, 2014, Stupka was staying at a hotel in Chicago before leaving for a business trip to Europe. (ECF No. 27, ¶ 45.) He invited Slepcevich to join him for dinner at the Rivers Casino. (*Id.*) Slepcevich accepted the invitation and informed her ex-husband and children that she would not be returning home that evening. (*Id.*, ¶ 46.)

Stupka and Slepcevich met at the hotel bar and shared a cab to the casino. (ECF No. 27, ¶ 47.) They had dinner at the casino restaurant, and then played slot machines. (*Id.*) After about an hour of gambling, they took a cab back to the hotel. (*Id.*, ¶ 48.)

Slepcevich retrieved an overnight bag from her car and accompanied Stupka to his hotel room. (ECF No. 27, ¶ 48.) Once in the hotel room, Slepcevich and Stupka began to have sexual intercourse. (*Id.*, ¶ 49.) During their sexual interaction, Slepcevich became ill and went to the bathroom to vomit. (*Id.*, 50.) Although they did not engage in any further sexual contact, Slepcevich stayed the night in Stupka's hotel room. (*Id.*, ¶ 51-52.)

Following their sexual interaction, Slepcevich and Stupka discussed keeping their relationship secret. (ECF No. 27, ¶ 53.) Stupka indicated that they could both lose their jobs if their relationship became known, and at his suggestion they deleted their text

message exchanges. (*Id.*, ¶ 54.) Stupka never told Slepcevich that she would lose her job if she did not engage in or continue to engage in a sexual relationship with him. (*Id.*, ¶ 55.)

On October 21, 2014, Stupka invited Slepcevich to his hotel room at the Grand Geneva Hotel. (ECF No. 27, ¶ 56.) The purpose of the invitation is disputed. Intertractor alleges that Stupka wanted to discuss their October 10, 2014 liaison and the need to end their relationship. (ECF No. 16, ¶ 56.) Slepcevich alleges that Stupka wanted to have additional sexual contact. (ECF No. 24, ¶ 24-25.) Nevertheless, it is undisputed that Slepcevich and Stupka did not engage in any further sexual contact. (ECF No. 27, ¶ 58.)

In November 2014 Slepcevich texted Stupka to say that she missed him. (ECF No. 27, ¶ 60.) That same month she also told Grimm that she and Stupka had had an affair. (*Id.*, ¶ 62.) Slepcevich told Grimm that she wanted to stop texting with Stupka. (*Id.*, ¶ 63.) Grimm suggested that Slepcevich could report to Human Resources, but noted that there may be consequences for doing so. (*Id.*, ¶ 65.) Grimm told Slepcevich that she did not want to be involved because Grimm had known Stupka's wife and her extended family for nearly two decades. (*Id.*, ¶¶ 65-66.)

Slepcevich never reported her relationship with Stupka (or any concerns arising from it) to Human Resources or any other entity identified in the company's reporting policy, nor did she make a compliance hotline report. (ECF No. 27, ¶ 68.) On December 9, 2014, Stupka approved a 16.70 percent increase to Slepcevich's salary, effective January 1, 2015. (*Id.*, ¶ 69.)

On December 13, 2014, Intertractor hosted its employee holiday party at the Lake Geneva Lodge. (ECF No. 27, ¶ 70.) Stupka attended the party with his wife Amy. (*Id.*) Slepcevich alleges that, after seeing her dance with a male co-worker at the party, Stupka remarked that she was giving her co-worker an erection like he never had before. (*Id.*, ¶ 72.)

Early the next morning Slepcevich sent a text message to Stupka which stated, "I am leaving. I can't stay because I love you too much." (ECF No. 27, ¶ 73.) Amy saw the text message, after which she left an emotional voicemail on Slepcevich's phone in which she referred to Slepcevich as a "homewrecker bitch," told Slepcevich to stay away from her family, and indicated that if Slepcevich failed to do so she would make sure Slepcevich didn't have a job. (*Id.*, ¶ 74.)

Amy had three subsequent conversations with Slepcevich: a second phone conversation on December 14, 2014, another phone conversation that occurred sometime prior to March 2015, and a text message exchange in which Amy reminded Slepcevich not to text Stupka for any reason after Slepcevich sent a text message to Stupka indicating that she would be absent from her scheduled shift. (ECF No. 27, ¶¶ 76, 81-84.)

After December 14, 2014, Slepcevich and Stupka engaged in no further personal communications. (ECF No. 27, ¶ 77.)

**Stupka Changes the Attendance Reporting Procedure**

Beginning in January 2015 Stupka worked from the Elkhorn office on an even less frequent basis. (ECF No. 27, ¶ 78.) On January 6 Stupka sent an email to Slepcevich, Lile, Ratkowski, and Grimm requesting that Slepcevich, Lile and Ratkowski text Grimm if they were going to be absent. (*Id.*, ¶ 79.) Stupka noted that he would continue to track attendance on his calendar and that they should still send their time off forms to him. (*Id.*, ¶ 80.)

**Correspondence between Amy and Slepcevich**

In late March or early April 2015 Amy sent a letter to Slepcevich's home address in which she discussed her feelings regarding Slepcevich and Stupka's affair. (ECF No. 27, ¶ 85; *see* ECF No. 22-7.) The letter contains no threat to Slepcevich's job status. (ECF No. 27, ¶ 86.) Several months later, in November 2015, Slepcevich sent a letter to Amy in which she apologized for her role in the affair with Stupka. (*Id.*, ¶ 88; *see* ECF No. 22-8.) Slepcevich wrote that she was "deeply sorry" for hurting Amy and her family and explained that she was "in a dark place in [her] life" that "caus[ed] [her] to make very wrong choices." (ECF No. 27, ¶ 90; *see* ECF No. 22-8 at 1.) Slepcevich expressed regret for her actions and asked for Amy's forgiveness. (ECF No. 27, ¶ 91; *see* ECF No 22-8 at 1.) After sending the letter, Slepcevich had no further communication with Amy. (ECF No. 27, ¶ 92.)

**Transfer of supervision of Intertractor's Customer Service Representatives**

In July 2015 Stupka, Archibald, and Oscar Bernardoni (Stupka's supervisor) decided to transfer the responsibility of supervising the customer service representatives from Stupka to Human Resources Generalist and Customer Service Manager Joanne Larsen. (ECF No. 27, ¶ 104.) Intertractor believed it was important to have someone onsite leading and managing the customer service representatives. (*Id.*, ¶ 105.) As such, from July 2015 through her retirement in March 2017, Larsen supervised the customer service representatives, which included making decisions regarding their daily work activities, discipline, and discharge. (*Id.*, ¶ 106.)

**Slepcevich's Termination**

After taking over as supervisor of the customer service representatives, Larsen received negative feedback from Slepcevich's co-workers regarding Slepcevich's performance. (ECF No. 27, ¶¶ 107-110.) Based on her interactions with Slepcevich, Larsen concluded that Slepcevich's communication skills were below expectations. (*Id.*, ¶ 112.) Larsen attempted to work with Slepcevich, including providing additional training opportunities for her. (*Id.*, ¶ 114.) However, she did not see a marked improvement in Slepcevich's performance. (*Id.*, ¶ 116.) In March and April 2016 Larsen received numerous additional complaints regarding Slepcevich's performance. (*Id.*, ¶ 119.)

Larsen made the decision to terminate Slepcevich's employment after concluding that she was unable or unwilling to perform critical aspects of her job, lacked both

initiative and follow-through, and did not have the desire to improve her performance. (ECF No. 27, ¶¶ 126-27.) Larsen discussed the decision with Archibald, who approved it. (*Id.*, ¶ 128.) Larsen and Archibald then notified Stupka of the decision. (*Id.*, ¶ 129.)

On May 5, 2016, Larsen and Archibald met with Slepcevich to inform her that Intertractor was terminating her employment. (ECF No. 27, ¶ 130.) Larsen and Archibald did not provide a detailed explanation for the decision, but simply told her that things weren't working out. (*Id.*)

On August 26, 2016, Slepcevich filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) in which she alleged that Intertractor discriminated against her on the basis of her sex. (ECF No. 27, ¶ 132.) Neither Larsen nor Archibald were aware that Stupka and Slepcevich had engaged in a romantic or sexual relationship until they received notice of Slepcevich's EEOC charge of discrimination. (*Id.*, ¶ 134.) Nor did either Larsen or Archibald know that Slepcevich had communicated with Stupka's wife or Grimm regarding her sexual interactions or personal communications with Stupka. (*Id.*, ¶ 136.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict

for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).

Slepcevich alleges that she was sexually harassed by Stupka, Amy, and Grimm in the following ways:

- In a text message exchange, Stupka told her that every time she would walk by his office he would check out her ass. (ECF No. 23 at 2.)

- At a team building dinner in 2014 Stupka claimed that he used to be a police officer in Iowa and explained that women in Iowa would get out of tickets by giving blowjobs to cops. (ECF No. 23 at 2.)

- After the September 16, 2014 dinner at the Grand Geneva Hotel, Stupka grabbed her arm when he asked her to spend time alone with him. (ECF No. 23 at 3.)

- She felt compelled to accept Stupka's invitation to spend time with him at Rivers Casino because he made it seem that he changed his travel plans for her, and she felt like she could not argue with him. (ECF No. 23 at 3.) While eating dinner at the casino restaurant she asked Stupka why she was there, to which Stupka replied, "because I want to take you back to my room and fuck the shit out of you." (*Id.*) In the hotel room, Stupka "demanded sex" and she acquiesced because she feared for her job. (ECF No. 1, ¶ 19.) Following their sexual encounter, Stupka reminded her on several occasions that she "owed him a blowjob." (ECF No. 23 at 3.)

- When Stupka invited her to his hotel room on October 21, 2014, he laid on top of the bed, invited her to join, and told her, "I didn't invite you here just to sit on top of the covers." (ECF No. 23 at 3.)

- She didn't report any of the details of her relations with Stupka because Grimm told her "that Stupka would lose his job, he would get divorced,

that his kids wouldn't go to college, that Stupka would lose everything, that

[she (Slepcevich)] would lose her job, and other people at Intertractor and

Intertractor itself would be affected." (ECF No. 23 at 4.)

- Amy Stupka threatened her job, set rules for her (including that she was not

  allowed to be alone or talk to Stupka), and sent a letter to her home address

  in April 2015. (ECF No. 1, ¶ 25.) She interpreted Amy's letter "as a threat

  against her job and her family." (ECF No. 23 at 4.)

- In November 2015, Grimm initiated a meeting with her and "instructed

  [her] to write a letter to Amy Stupka in order to ask [for] her forgiveness[.]"

  (ECF No. 1, ¶ 27.)

Slepcevich argues that "Stupka's sexual advances and sexual acts, Amy Stupka's

communications to [her], and Grimm's instructions and … unwillingness to do anything

about the harassment created a work environment that was both subjectively and

objectively hostile." (ECF No. 1, ¶ 34.)

 In moving for summary judgment, Intertractor argues that Slepcevich's hostile

work environment claim fails because (1) it is untimely, and (2) even if it were timely, she

has not established essential elements of her claim. (ECF No. 17.)

## I.     Timeliness

Before bringing a lawsuit in federal court under Title VII, a plaintiff must file a

charge of discrimination with the EEOC within 300 days "after the alleged unlawful

employment practice occurred." 42 U.S.C. § 2000e-5(e); *see Wheeler v. Brady Corporation*, 712 F.2d 801, 819-20 (E.D. Wis. 2010). However, under the continuing violation doctrine, a court may consider otherwise time-barred conduct for purposes of a hostile work environment claim so long as "an act contributing to the claim occurs within the filing period." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *see Barrett v. Illinois Dept. of Corr.*, 803 F.3d 893, 898-99 (7th Cir. 2015). "A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether *any act* falls within the statutory time period." *Morgan*, 536 U.S. at 120 (emphasis added).

Slepcevich filed her charge of discrimination on August 26, 2016. (ECF No. 27, ¶ 132.) Therefore, her hostile work environment claim is timely if she can identify sex-based comments or actions that occurred on or after October 31, 2015.

Intertractor argues that "*each* of the … actions that … make up Slepcevich's hostile environment claim falls outside the applicable statute of limitations." (ECF No. 17 at 17.) (Emphasis in original.) "Whatever the nature of the romantic relationship between Slepcevich and Stupka, it is undisputed that the relationship and the communications between Slepcevich and Stupka regarding it ceased by December 14, 2014." (*Id.*) Similarly, "the last time Amy communicated with [Slepcevich] was in early April of 2015." (*Id.*)

In response, Slepcevich argues that "[t]wo crucial component acts contributing to [her] sexual harassment claim *did* occur within the 300-day period prior to the filing of the EEOC charge—and these component acts are intrinsically related to [her] sexual relationship with Stupka." (ECF No. 23 at 7.) (Emphasis in original.) First, she alleges that "Stupka's intentional failure at *any point* between October 2014 and the filing of the EEOC charge to notify [Human Resources] of the sexual relationship as required by the … Code of Conduct … is the quintessential covert act to evade responsibility for sex discrimination." (ECF No. 23 at 7.) (Emphasis in original). However, Slepcevich has not offered any evidence or authority from which it can be reasonably inferred that Stupka's failure to report their relationship was harassment, let alone sexual harassment. Moreover, even if it could be construed as such, Stupka's duty to report their relationship ceased on December 14, 2014 (long before October 31, 2015) when Stupka and Slepcevich were no longer romantically involved. (*See* ECF No. 21-9 at 17 (requiring employees who are *in* a romantic relationship with another employee within their "span of control" to report their relationship).)

Slepcevich also alleges that she was sexually harassed by Grimm in November 2015 "when Grimm instructed [her] to write a letter to Amy Stupka and ask Amy's forgiveness. (ECF No. 23 at 7-8.) However, once again, Slepcevich has not offered any evidence or authority from which it can be reasonably inferred that Grimm's instruction to write a letter to Amy was sexual harassment. *See Diadenko v. Folino*, 741 F.3d 751, 757-

58 (7th Cir. 2013) ("[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.").

As such, even construing the evidence in favor of Slecepvich, there is no genuine issue of any material fact with regard to the timeliness of Slepcevich's Title VII hostile work environment claim. Slepcevich's hostile work environment claim is untimely, and Intertractor is entitled to judgment as a matter of law.

## II.    Elements of a Hostile Work Environment Claim

Even if Slepcevich's hostile work environment claim was timely, her claim still would not survive summary judgment.

"To survive summary judgment on a hostile work environment claim, a plaintiff must prove four elements: '(1) the plaintiff's workplace was both subjectively and objectively offensive; (2) the plaintiff's sex was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability.'" *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017) (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016)). Assuming without deciding that Slepcevich's allegations satisfy the first three elements of a Title VII hostile work environment claim, there is no basis for employer liability. *See Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048-49 (7th Cir. 2000) ("We do not decide whether a hostile

work environment existed because the question whether [the employer] took prompt and effective action is dispositive here.").

Under Title VII, the standard for imputing liability for workplace harassment on an employer depends on whether the harasser is a supervisor (Stupka), co-worker (Grimm), or nonemployee (Amy).

**A. Intertractor's Liability for Stupka's Alleged Harassment**

"If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). However, if no tangible employment action is taken, an employer may escape liability for a supervisor's harassment "by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 570 U.S. at 424 (citing *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). Slepcevich alleges that she suffered a tangible employment action when she was terminated from Intertractor on May 5, 2016 (about seventeen months after her affair with Stupka ended). (ECF No. 23 at 14.)

Although it is true that Slepcevich's employment was terminated by Intertractor, there is no evidence that she was terminated *because of* Stupka's alleged sexual harassment. The decision to terminate Slepcevich's employment was made by Joanne

Larsen (Slepcevich's immediate supervisor) after she concluded that Slepcevich was unable or unwilling to perform critical aspects of her job, lacked initiative and follow-through, and did not have the desire to improve her performance. (ECF No. 27, ¶ 126.) Larsen discussed the decision with her supervisor, Tim Archibald, who approved it. (*Id.*, ¶ 128.) Larsen and Archibald then *informed* Stupka of the decision. (*Id.*, ¶ 129.) Slepcevich has not offered any evidence from which it can be reasonably inferred that Stupka influenced (or was involved with) Larsen's decision to terminate her. Furthermore, it is undisputed that Larsen and Archibald were both *unaware* that Slepcevich and Stupka had engaged in a romantic or sexual relationship. (ECF No. 27, ¶ 134.) As such, no reasonable jury could find that Slepcevich suffered a tangible employment action as a result of Stupka's alleged sexual harassment.

Since no tangible employment action was taken as a result of Stupka's alleged sexually harassing conduct, Intertractor may escape liability for Stupka's alleged conduct so long as (1) it exercised reasonable care to prevent and correct sexual harassment; and (2) Slepcevich unreasonably failed to take advantage of the preventative and corrective opportunities provided by the company. *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

The first element of the *Ellerth/Faragher* affirmative defense is often satisfied by the existence of an appropriate anti-harassment policy. *Shaw v. Autozone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999). It is undisputed that Intertractor's Code of Business Conduct

prohibited harassment on the basis of sex. (ECF No. 27, ¶ 26; *see* ECF No. 21-9 at 10-11.) It provided employees with multiple reporting avenues: their immediate manager, their manager's manager, the Human Resources Department, the Corporate Compliance Department, the General Counsel or legal staff, the Director of Internal Audit, and/or the Company's Compliance Hotline (which could be done anonymously). (ECF No. 21-9 at 7.) It also provided that the "company takes every report seriously" and assured employees that a known or suspected violation "will be addressed thoroughly and promptly." (*Id.* at 8.)

Slepcevich argues that "Intertractor's affirmative defense … fails on the first element" because "[t]he clear language of the Code of Business Conduct requires the reporting of consensual sexual relationships within an employee's span of control" and Stupka never reported his relationship with her. (ECF No. 23 at 15.) She alleges that "[Intertractor] cannot reasonably assert that it took reasonable care to prevent harassment if its own General Manager [(Stupka)] disobeyed the very clear written directive in the Code of Business Conduct on which he actually even received training." (*Id.*)

Slepcevich's argument misses the point. Intertractor's policy of reporting workplace relationships was not implemented for the purpose of detecting, preventing, or correcting sexual harassment. Rather, it was implemented to help "avoid conflicts of interests," such as favoritism or impropriety. (ECF No. 21-9 at 17.) Stupka's

noncompliance with a policy wholly unrelated to sexual harassment is not proof that Intertractor failed to exercise reasonable care to prevent and correct sexual harassment.

The second element of the *Ellerth/Faragher* affirmative defense is often satisfied by proof that an employee unreasonably failed to use any complaint procedure provided by the employer. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 778. It is undisputed that Slepcevich never reported Stupka's alleged sexually harassing conduct to any of the multiple reporting avenues provided in the Code of Business Conduct. (ECF No. 27, ¶ 68.) It is also undisputed that Slepcevich received a copy of the Code of Business Conduct in January 2014 and understood that she was expected to comply with the policies contained within it. (*Id.*, ¶ 31; *see* ECF No. 21-9 at 35.)

As such, there is no genuine issue as to any material fact with regard to the alleged sexually harassing conduct by Stupka, and Intertractor is entitled to judgment under the *Ellerth/Faragher* affirmative defense as a matter of law unless liable for the conduct of Grimm or Amy.

### B. Intertractor's Liability for Grimm's and Amy's Alleged Harassment

"[A]n employer is liable for the harassment of a nonemployee or nonsupervisory employee if it was 'negligent either in discovering or remedying the harassment.'" *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017) (quoting *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (internal citation omitted)). "To prove negligence, an employee usually must make a 'concerted effort to inform the employer

that a problem exists.'" *Id.* (quoting *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004) (internal citation omitted)). "This would include lodging a complaint with human resources or telling high-level management about the harassment." *Id.*

It is difficult to interpret Grimm's conduct as harassment of any sort. Nevertheless, Slepcevich has not presented any evidence from which it can be reasonably inferred that she made an effort to inform Intertractor about Grimm's or Amy's alleged sexually harassing conduct. As such, there is no genuine issue as to any material fact with regard to the alleged sexually harassing conduct by Grimm or Amy, and Intertractor is entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that Intertractor's motion for summary judgment (ECF No. 15) is **granted.** The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of January, 2019.

WILLIAM E. DUFFIN
U.S. Magistrate Judge